# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **HECTOR HERNANDEZ,** | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) No. 07 C 3590 |
| **DEE BATTAGLIA, et al.,** | ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Hector Hernandez ("Hernandez"), who is a prisoner at Stateville Correctional Facility ("Stateville"), has filed this action against certain prison officials alleging that his Eighth Amendment rights were violated under 42 U.S.C. § 1983. Defendants have moved for summary judgment. For all the reasons that follow, that motion is granted.

## I. Factual Background

On September 1, 2005, a facility-wide tactical team shakedown was performed at Stateville in order to search for illegal drugs and contraband in the facility. As was typical, the water was turned off during the shakedown to prevent inmates from flushing any contraband down the toilet or sink. Approximately 800 inmates were out of their cells throughout the day as part of the shakedown operation, and approximately 200 inmates were outside of their cells at any given time during each rotating shift. As part of the shakedown, the inmates were strip-searched, drug-tested and had

their cells searched.  By the prison officials' own estimation, each shift of inmates should have been completed in approximately two hours.

On the morning of the shakedown, plaintiff ate breakfast at 3:30 a.m., and the water was turned off sometime between 5:00 a.m. and 7:00 a.m.[1]  Between 9:00 and 10:00 a.m., the tactical team began to perform a strip search and shakedown of the inmates in plaintiff's gallery.  At that time, plaintiff was strip searched, then handcuffed behind his back and escorted from his cell and taken to the gym.  Once in the gym, plaintiff gave a urine sample to be drug tested and then fully emptied his bladder into the

---

[1] Plaintiff's recitation of the pertinent timeline of events has not been consistent throughout these proceedings. On September 3, 2005, two days after the event, plaintiff completed a detailed grievance form.  In that form, he states that the water was turned off at 7:00 a.m.  In his deposition, which occurred three years after the incident, however, he stated that the water was turned off "[a]bout 6:00 or 7:00[,]" "[m]ight have been even 5:00 at that time.  I didn't have no watch.  It's an approximation."  11/7/08 Pl. Dep. at 8:24-9:1-4. Similarly, in the grievance form, plaintiff claims that the tactical team began the shakedown at 10:00 a.m.  In his deposition, he stated that "we could have left at 9:00, we could have left at 9:30.  I didn't have a watch."  11/7/08 Pl. Dep. at 15:5-15.  Finally, with respect to the amount of time he was outside in the yard, plaintiff's grievance states that he was back in his cell between 3:30 p.m. and 4:00 p.m.  Plaintiff's amended complaint states that he was returned to his cell between 2:45 p.m. and 3:00 p.m.  Then, in his November 7, 2008 deposition, he stated that because the prison was on a lockdown schedule and because the food tray was waiting for him in his cell, "it had to be anywhere after 3:30" when he returned to his cell. 11/7/08 Pl. Dep. at 41-42.  These discrepancies are not material, however, to the resolution of this motion.  The court will analyze plaintiff's claim using the timeline most favorable to him (i.e., the longer timeline described by him in his deposition).

2

toilet.  At no time during the shakedown did plaintiff need to take a bowel movement.  Because plaintiff was able to provide a urine sample, he did not ask for any water while he was at the gym.  After all the inmates in plaintiff's gallery were drug tested, plaintiff's group was moved outside to one of the segregation yards.  According to plaintiff, his group was kept in the segregation yard for approximately three to five hours.  The temperature that day was 80-85 degrees and the segregation yard was unshaded.  While there, the inmates remained handcuffed and did not have access to restroom facilities, nor were they offered any food or water.  Plaintiffs and the other inmates could sit on the ground or walk around the yard.  After leaving the segregation yard, plaintiff and the other inmates were taken to the mess hall, where they were made to sit down.  Plaintiff and the other inmates were then returned to their cells sometime after 3:30 p.m.  Upon being returned to his cell, plaintiff's handcuffs were removed and plaintiff's dinner was waiting for him.  The water was turned on to his cell sometime around 5:00 p.m. or 6:00 p.m.  After the incident, plaintiff's wrists were swollen for three days and he has experienced pain in his right shoulder and wrists since the shakedown.

## II. Analysis

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 248. The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).

"The Eighth Amendment prohibits unnecessary and wanton infliction of pain, forbidding punishment that is 'so totally without penological justification that it results in the gratuitous infliction of suffering.'" *Perales v. Bowlin*, 644 F. Supp. 2d 1090, 1098 (N.D. Ind. 2009) (quoting *Gregg v. Georgia*, 428 U.S. 153, 183 (1976)). A conditions-of-confinement claim, such as the one presented by plaintiff, has both an objective test and a subjective test. *Wilson v. Seiter*, 501 U.S. 294, 298, 303 (1991). The objective test asks whether the alleged condition of confinement is "'sufficiently serious' so that 'a prison official's act or

4

omission results in the denial of the minimal civilized measure of life's necessities.'" *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). If this objective test is met, then I must determine if the prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

Turning to the objective test, I must first determine if the shakedown conditions were "sufficiently serious" so that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. Conditions which are merely unpleasant will not satisfy the objective component: "To the extent such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Two district courts recently concluded that the identical shakedown conditions at issue here did not rise to the level of a constitutional deprivation. Two other Stateville inmates, who were housed in the same prison gallery as plaintiff and experienced the same series of events on September 1, 2005, recently had their cases dismissed at the summary judgment stage. In *Curiel v. Larry Stigler and Rodney Brady*, No. 06 C 5880, 2008 WL 904894 (N.D. Ill. Mar. 31, 2008), Judge Zagel concluded that the deprivations experienced by the inmates were not, either

5

individually or cumulatively, serious enough to survive a motion for summary judgment. Similarly, in *Ames v. Larry Stigler and Rodney Brady*, No. 07 C 430, slip op. at 5 (N.D. Ill. Sept. 3, 2009), Judge Gettleman also granted defendants summary judgment, ruling that Ames's claim did not rise to the level of an Eighth Amendment violation, stating, "[a]lthough the conditions during the shakedown seem unnecessarily severe, the court notes that this was a single occasion, a special shakedown requiring the entire cell block to be shut down for a thorough drug search because of drug problems in the cell block."

Having reviewed these opinions, as well as the pertinent caselaw, I join Judges Zagel and Gettleman in concluding that the circumstances surrounding the shakedown, although "unnecessarily severe," are not the kind of serious deprivations which would give rise to an Eighth Amendment violation. While it is true that, in general, correctional officials must ensure that inmates receive adequate food, clothing, shelter, protection, and medical care, *Henderson v. Sheahan*, 196 F.3d 839, 844 (7th Cir. 1999), an occasional missed meal does not rise to the level of a constitutional violation. *See, e.g., Knox v. Wainscott*, No. 03 C 1429, 2003 WL 21148973, at *8 (N.D. Ill. May 14, 2003); *Cunningham v. Eyman*, No. 95 C 2900, 2000 WL 748098, at *6 (N.D. Ill. Jun. 9, 2000). Likewise, the fact that plaintiff was not given water during the shakedown also is not the type of "serious" deprivation

6

which would be actionable under § 1983. While plaintiff testified that he has high cholesterol, the court is unaware of any specific health problem he has which would have necessitated water. And with respect to the fact that he could not access restroom facilities, plaintiff testified that he completely emptied his bladder while in the gym, he was able to wait until he returned to his cell to urinate, and he did not feel any urge to have a bowel movement while he was handcuffed. In light of these facts, plaintiff's lack of bathroom access is not a violation of the Eighth Amendment. Occasional discomfort is "part of the penalty that criminal offenders pay for their offenses against society." *Lunsford v. Bennett*, 17 F.3d 1574, 1581 (7th Cir. 1994) (citations omitted). These inconveniences are relatively minor, and are not the type of "serious" deprivation which would be actionable under § 1983.

With respect to the fact that plaintiff and the other inmates were handcuffed behind their backs for approximately eight to nine hours (giving plaintiff every benefit of the doubt with respect to the timeline of events), this aspect of the shakedown too fails to satisfy the objective test. Defendants have put forward evidence that, for safety purposes, the inmates are handcuffed during prison shakedowns. While it is not entirely clear why the shakedown on September 1, 2005 lasted so much longer than the normal two-hour period usually required to complete a gallery's shakedown, it is

7

reasonable for a maximum security prison, when conducting a special shakedown which involved moving over 800 inmates outside of their cells, to utilize handcuffs. Plaintiff's expert opines that the use of handcuffs was not necessary, but the question before me is not whether the prison officials conducted their shakedown in the least restrictive manner possible. Rather, under the objective test announced in *Farmer*, I must determine whether the events which actually occurred violated the Eighth Amendment. I find that the use of handcuffs in this instance, given the security concerns and unique circumstances surrounding the execution of the shakedown, was not the kind of serious deprivation which would be actionable under the Eighth Amendment.[2] *See, e.g., Key v. McKinney*, 176 F.3d 1083, 1086 (8th Cir. 1999) (holding that being shackled and handcuffed for twenty-four hours does not violate Eighth Amendment). Plaintiff admitted that the handcuffs were "kind of loose," 11/7/08 Pl. Dep. at 61:15, and he never complained to anyone that he was in any pain or discomfort, even though accommodations were made for inmates with medical conditions who could not be handcuffed behind their back for long periods of time.

---

[2] As the defendants point out, the United States Supreme Court has said that police may handcuff private citizens for several hours during a search without offending the Constitution. *Muehler v. Mena*, 544 U.S. 93, 99 (2005). While not directly on point, *Muehler* certainly supports the notion that prison officials, in moving over 800 inmates during a special security event, could similarly restrain inmates (who are entitled to fewer constitutional protections than those who are not incarcerated) for several hours.

Nor did he ask the medical technician, who was present throughout the shakedown, to remove his handcuffs. Further, plaintiff has failed to provide any evidence which would allow me to attribute the wrist and shoulder pain he alleges he has with the handcuffing.

Finally, plaintiff argues that exposing the inmates to high temperatures[3] for three to five hours violated his Eighth Amendment rights. I disagree. Inmates certainly have the right to be free from extreme hot and cold temperatures. *Shelby County Jail Inmates v. Westlake*, 798 F.2d 1085, 1087 (7th Cir. 1986); *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997) (holding that the temperature's severity, its duration, whether the inmate has alternative means to protect himself from the extreme temperatures, and whether there are other uncomfortable conditions combined with the temperature must be considered in determining whether conditions of confinement are unconstitutional). Here, plaintiff and his fellow inmates were out in the yard in 80-85 degree weather for three to five hours. While unfortunate that the inmates were forced to remain outside, handcuffed, on a hot day without water or shade, this exposure to the elements is just not severe or serious enough to warrant relief under the Eighth Amendment.

---

[3] Plaintiff's assertion that the temperature out in the yard at Stateville was 100 degrees is totally unsupported by the article provided by plaintiff. The evidence submitted by defendants, from The Weather Station History for Joliet, Illinois for September 1, 2005, establishes that the temperature at noon was 80.9 degrees and the high temperature for the day was 85.7 degrees at 3:05 p.m.

In arguing that the events described by plaintiff, taken cumulatively, violated his constitutional rights, plaintiff relies primarily on *Hope v. Pelzer*, 536 U.S. 730 (2002). In *Hope*, an inmate from Alabama (the only state at the time which engaged in the practice of handcuffing inmates to a hitching post if they refused to work or disrupted work squads) was twice handcuffed to a hitching post for disruptive conduct. *Id*. at 733-34. During the first incident, Hope was working on a chain gang and got into an argument with another inmate. *Id*. at 734. Both men were taken back to prison and handcuffed to a hitching post. *Id*. During two hours on the post, Hope was offered water and bathroom breaks. *Id*. Because he was only slightly taller than the hitching post, Hope's arms were above shoulder height and whenever he tried to move his arms to improve his circulation, the handcuffs cut into his wrists, causing pain and discomfort. *Id*. Two months later, Hope was involved in a "wrestling match" with a guard. *Id*. Four other guards intervened, subdued Hope, handcuffed him, placed him in leg irons and transported him back to the prison where he was put on the hitching post. *Id*. The guards made him take off his shirt, and he remained shirtless all day while the sun burned his skin. *Id*. at 734-35. He remained attached to the post for approximately seven hours, during which time he was given water once and no bathroom breaks. *Id*. at 735. At one point, a guard taunted Hope about his thirst by giving water to some dogs, bringing over a

water cooler to Hope, and then spilling the water onto the ground. *Id*. Finding that the actions were punitive and served no penological purpose, the Court upheld the appellate court's conclusion that the prison officials violated Hope's Eighth Amendment rights. *Id*. at 737-38.

The facts in *Hope* are distinguishable from those in this case. In *Hope*, there was no underlying security reason for handcuffing Hope to the hitching post. The inhumane use of the hitching post and other actions taken in *Hope* were purely punitive, as any safety concerns had long abated by the time Hope was handcuffed to the hitching post. In addition, stripping off Hope's shirt and handcuffing him in such a way that his arms were above his shoulders were actions taken only to increase Hope's pain. Here, while defendants can be faulted for extending the shakedown process a few hours longer than it might otherwise have taken, there is no direct or circumstantial evidence suggesting that prison officials took any of the actions at issue in order to punish the inmates. Plaintiff does not dispute that the shakedown process itself was legitimate, and there is no evidence that it was purposefully extended to cause harm to the inmates. In this case, there was no attempt made to worsen the effects of the sun and heat, nor was there any taunting or obvious enjoyment on the part of the prison guards or officials. In the end, the severity of the punishment in

*Hope*, as well as the lack of a penological purpose, distinguish *Hope* from this case.

In addition to examining these events individually, I have also considered them cumulatively. Even taken together, they are not sufficiently severe to rise to the level of an Eighth Amendment violation. Because the actions taken by prison officials during the September 1, 2005 shakedown do not violate *Farmer*'s objective test, I need not reach the subjective test.

## III. Conclusion

For all the foregoing reasons, defendants' motion for summary judgment is granted.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: December 14, 2009